Good morning. My name is Mary Geddes and I represent Brian Henry. Brian Henry is the appellant. This court has asked in the aftermath of the Blakely v. Washington decision from the United States Supreme Court to be prepared to argue its relevance if any. In Brian Henry's sentence appeal, he also has an appeal, of course, of search and seizure issues. His sentence appeal concerns issues that are well-timed for appellate action under Blakely. Blakely held that the relevant statutory maximum is not the maximum sentence the judge may impose after finding additional facts, but the maximum he may impose without any that the jury's verdict alone does not allow. The jury has not found all the facts which the law makes essential to the punishment. Of course, Blakely was not a holding specific to the federal sentencing guidelines, but Justice O'Connor herself in her stint noted that to the extent that differences, structural differences, exist between the Washington Act and the federal assessments of relevant conduct and specific offense characteristics apply hard constraints to a sentencing court's decision by requiring specific factual findings. That's exactly what we have here. The relevant issues and facts here are that, first of all, there were Rule 11 errors, a failure to advise a defendant that he had a right to persist in his not-guilty plea, a failure to denial of his pre-sentencing motion to withdraw his plea on the grounds that he had been misadvised by his attorney as to the maximum sentence he faced. I don't actually see how you get started on that issue since Ninth Circuit law is clear that an attorney's erroneous prediction of sentence is not a good ground for setting aside the plea or for ineffective assistance. Well, I think, in fact, what happened in this context was, indeed, fundamentally problematic because what we have, of course, in Blakely is a determination that the kinds of sentencing factor which was Hold on. You and I are talking about two different things. Yes. I'm talking about the lawyer's mistake. I think the most you'll get or the sentence you'll probably get is X and it turns out it's X plus Y. My recollection is that Ninth Circuit law on that is tough luck, no ground for ineffective assistance, no ground for withdrawal of the plea. The Blakely issue is different. You didn't have a chance to have a jury decide whether you did such and such, so you can't be sentenced for doing such and such. We have to decide to what extent that's applicable. I thought it was two different things, but I was asking about the first. Let me go back to Blakely and make my remarks specific to Blakely before responding to that specific issue. Of course, in this case, the relevant facts are that Mr. Henry entered a guilty plea to a substitute information alleging that he had possessed MDMA with the intent to distribute in April 2002. He was in criminal history category one. No quantities were alleged in the substitute information. None were admitted with respect to this conditional plea. The base offense level is... But did he admit with respect to drug quantity? He did not make any admissions as to drug quantity. All right. So that seems to be a clear Blakely issue because obviously there's no jury that found it beyond a reasonable doubt. That's correct. So you would have both drug quantity and then the relevant conduct of the charge in Louisiana, which have not yet been proven. That's true. So those are your two Blakely issues. That's true. I'm just wondering whether your office has come to some sort of position as to whether you are now arguing that the sentencing guidelines in toto are unconstitutional or are you arguing that those provisions which provide for sentence enhancements for drug quantity when there's none admitted or found beyond a reasonable doubt are relevant conduct in the same category, that those provisions alone are unconstitutional based on the analysis in Blakely? Yes. And severable. And severable. Yes. So that's... I can't represent that to be an office physician. That's your argument in this case. That's my position in this case. I should note that we have not formulated an office physician as such. And the Department of Justice has not formulated a physician? I do not know. Maybe we can find out in the next argument. So, of course, it's Mr. Henry's position that the only... because there were no other findings made by the court other than drug-related quantities, that he needs to be resentenced at the base offense level of eight. With respect to the other issues, I guess, he had sought to withdraw his plea in the alternative to the relevant conduct being struck, just to make clear that that was the remedy he sought when he was... Right. But I'm with Judge Kleinfeld. I don't see the relation on those issues. Well, the objection below was made on constitutional grounds, which is essentially a deprivation of liberty without due process of law under Hahn and including in re-winship. I'm going to leave the rest of my time for response. Thank you. May it please the Court. I'm Stephen Cooper for the United States. There are so many issues here that it's hard to decide where to start. Do we need to decide whether he was arrested or only stopped when they put the handcuffs on him? No, it is not necessary. Or do we get to the same place either way? That's correct, Your Honor. There's ample support in the record for the district courts finding that it was a reasonable Terry detention, and the factors supporting a Terry detention are numerous. They were set forth very well in the district courts. Do you really contend that two hours in handcuffs is a reasonable Terry detention? Well, I think the record would not support the conclusion that he was in handcuffs for the entire two hours. Okay. Let's say he was held in custody for two hours going around looking for a pharmacy. You think the duration of that is a reasonable Terry stop? I think that one has to look at all the facts, not strictly the time on the clock. The court below found that it started at 6 and ended at 8. But there was also an indication that it may have been a little after 6. In addition, the reason for going to the hospital, and it was the Army hospital on the military base that they went to, was because the defendant's statement that it was his medication and he needs to take 10 of these pills every day. And the testimony of the agent was that he was highly concerned about whether he might be depriving him of a needed medication and didn't want to be in that position. Well, Terry stops are supposed to be a brief, temporary duration. Correct, but if there is ground for a reasonable suspicion, the officer is supposed to take what reasonable steps are necessary to confirm or dispel that suspicion. He could leave him there and go check out the pills on his own and just know where to find him later if he needed to arrest him. But there was a specific finding by the district court that the defendant was traveling, that he would be difficult to locate if he were released, and that the only reasonable action on the part of the agent was to hold him until he found out what the pills were. So under that reasoning, you could hold him for days. You couldn't find out what the pills were if they were some kind of exotic pills. I don't think that we could go on for days. But the question is really whether what he did with the facts that he had, which were numerous facts pointing to suspicion that these were illegal drugs, what he did, whether that was reasonable considering all the circumstances. And under SHARP, the Supreme Court case, I think it's 470 U.S., it was considered important that a large part of the time of the detention consisted of trying to dispel some false information that the defendant had given or evasive actions of the defendant. Your argument so far is to show why, despite the cuffs and the duration, it should be regarded as a Terry stop. But my question was directed at something else. My question was, do you need to establish that it was a Terry stop rather than an arrest, or do you get to the same conclusion in the case either way? Well, of course, we analyzed it, Your Honor, as a Terry stop, but in the event that it was… Let's say it's an arrest for purposes of discussion. All right. Then what? It would be a question whether the facts that were within the knowledge of the officer at the time constituted probable cause. Did he have probable cause for an arrest? We felt that he had probable cause from the beginning. As soon as he got the inherently incredible explanation from Henry that these were his medication that he had a prescription for and he had to take ten of them every day and all he had to do was not only notice that he couldn't produce a prescription, even given time to make telephone calls, which he had the freedom to do, but also noticing that the pills themselves, the capsules, were strongly inconsistent with the appearance of a prescription drug and strongly consistent with the appearance of an illicit drug. What was it about the appearance? I'm thinking… There were 800 of them. I ordinarily wouldn't be carrying my prescription with me. The doctor just phones it to the pharmacy and I usually don't even get it physically. True, but there would be some marking on the container that would tend to show that it was a prescription or at least it would show that it was some kind of a manufactured drug. There were 800 of them to start with, around 800. They were separated into eight baggies of approximately 100 apiece. The bags were tied off at the top, little sandwich baggies tied off at the top. So you're saying this is one sick puppy if he has to carry 800 pills with him. Well, not only that, but they all looked a little different. They were disparate sizes and there were no markings on them. Was he able to remember the doctor's name? Was he given an opportunity to call his doctor? Yes, he could not remember a name, but he did call. The testimony is that while he was in the patrol car, he used his own cell phone to make a phone call, one or more phone calls. He can't remember whether there was a distinction and appeared to be questioning somebody about this prescription, but it came up dry, so to speak. So why didn't the police just arrest him if they had probable cause and why didn't you make that argument below? To me, it seems that the Terry stop is somewhat of a ridiculous argument. Either you had an arrest or not. And I can see a third way myself that this could be affirmed, but I don't understand why your officer would take the position that this was a Terry stop. Handcuffs, he was told he wasn't free to leave. You probably did have ample probable cause to make the arrest, but they didn't do it. We analyzed it that way. The district court chose to view it that way. Our position was actually that it was justifiable both as a Terry detention and as an arrest supported by probable cause even though the officer himself didn't intend it that way. And the district court chose to analyze it entirely as a Terry stop and made factual findings that are very supportive of that. There's a series of suspicious circumstances that strongly indicated that it was appropriate to find out what these pills were and to take whatever action was necessary to resolve that question, starting with dispelling the defendant's contention that they were his medication. So one doesn't necessarily need to say that that was an unreasonable approach, but of course the rule is whether or not the district court chose the reason that this court chose, if they reached the right result, then the ruling should be upheld in any event. Did he ever say what disease he supposedly had that he needed 800 pills for? He did. He said it was sickle cell anemia, and he gave a medication name like Xetaphan or Zytophan or something along that line. With that information and going to the hospital with the pills and with that information, the agent was still unable to obtain any identification of that at the hospital as being any kind of medication at all and then began to apply his test kit to it. And it was the fact that his test kit was inadequate to identify the amphetamine that was present that required calling the DEA, and that took an additional 45 minutes for the DEA to arrive. But there wasn't anything else he could do. It certainly would have been unreasonable for him to release the individual who was traveling from out of town, claim not even to know the person whose room he was trying to enter, and the room itself had been obtained fraudulently. He and his companions, none of them knew who the person was whose room they were trying to enter and one of them had marijuana on him. The room itself contained marijuana. It was a crime scene. It was considered to be a crime scene. The defendant and his companions were all trespassers on a military reservation. So it was a situation calling for detention until they could be removed from the post, until the drugs in the bag turned up, and then it called for detention until the allegation that it was his medication could be either confirmed or ruled out, or that the items in the – that the pills that had been found could be identified as an illicit drug or nothing that's identifiable as an illicit drug. The testimony of the agent was clear that that was his intention. So it was an ongoing investigation, and at each step the suspicion heightened, and we would also contend the probable cause heightened at that point also, because when he goes to the hospital and the professionals can't identify this as any kind of medicine, not only is it – does it rule out that it's medicine, but it also rules out the credibility of the defendant and implies that what he told a lie for was to cover up the fact that it was illicit drugs and really strengthens the probable cause at that point. It wouldn't have been necessary to find out what drug it was if there was sufficient probable cause that it was some kind of a controlled substance. We thank the court for that. Counsel, I mean, you know, the law in Terry Stubbs does not turn on the officer's intention. It turns on diligence and duration. And what you're arguing that really troubles me about it, aside from whether I think you're going to – you should prevail or not in this case, but it just really bothers me that you could have a situation where you take somebody in handcuffs and then take them along with you as you develop more and more evidence against them, and it's, you know, who knew when they'd ever come up with the drugs? I mean, isn't this the kind of indefinite detention that you either ought to at some point say, you're being arrested or let the person go? Even the Supreme Court's been frowning on indefinite detentions lately. I wouldn't agree that the record supports that it's indefinite. The finding of the district court, a factual finding that is clearly supported, is that the officer was diligent in doing the only thing that he really could do. The diligence does not supplant duration in the analysis of a Terry Stubb. If we were to subtract from this Terry Stubb the time consumed in attempting to confirm or rule out the false statement of the defendant as to the fact that this was medication, which we have to do under Sharp and under Richards, I believe it is, a Ninth Circuit case which we cited, then this is not much different from detentions that have been upheld as not being too long in duration, that have been an hour to an hour and a quarter by this court. And one of the better cases explaining this whole situation is Gallegos versus the City of Los Angeles, which says there's no mechanical checklist and the time alone isn't a factor, but it's a fact-specific inquiry guided by reasonableness, and that depends on what it was, the nature of the suspicion was, and what the officer did in order to try to dispel that suspicion. We agree that he had probable cause, and that probable cause, whether he acted upon that to arrest the person or not, is sufficient to uphold a de facto arrest if it's found to be that. But we also agree with the district court's finding that he acted diligently and reasonably in pursuing the only options that were available to him at the time. In Gallegos, the person, the suspect, was arrested at gunpoint, handcuffed, and put in a patrol car and taken away on a tour that lasted about 45 minutes to an hour to see whether he could be identified as the suspect that was the reason for the police. Did you say he was arrested in Gallegos? No, he was, if I said that, he was detained, he was put in handcuffs at gunpoint and put into a patrol car, and it took 45 minutes to an hour to get him back to where he belonged, and the purpose was to identify him, as to whether he was the person that the complaint had been lodged against. Are you going to address the Blakeley issues? Yes, I would like to do that. I don't want you to run out of time. Very well, thank you. First of all, while there may have been objections made to the relevant conduct below, I think there was no objection made on the ground that is asserted, that arises under the Blakeley opinion. That is, there was no Apprendi-type objection below, that it was unconstitutional to apply the relevant conduct provisions without a jury finding. But you're aware of the law in the Ninth Circuit, that a change of law applies to all pending cases, right? True. And it doesn't matter, the court will look at it sua sponte under our case law. But it would have to be a plain error analysis because of the lack of an objection. I think there is no error. I don't think so. I don't think that's exactly how that law reads, because then you would say, is it harmless? And what we have here is a major change in the law. But let's not argue that. Let's just say assume Blakeley applies. Assume it applies. You're saying that how would Blakeley apply to this case at all from your perspective? And I guess this goes to the Department of Justice. This is my first Blakeley case since Blakeley came down. So I'm just wondering, have there been any positions taken by the Department of Justice? Are you all going to handle this on a case-by-case basis? What I will explain is the position that I believe is supported by the Department of Justice, and that is that Blakeley does not apply to this because, first of all, Blakeley said that it expressed no opinion on the federal guidelines, and Apprendi said the same thing. We expressed no opinion on the applicability of Apprendi to the guidelines beyond what this court has already held, clearly referring to the existence of Supreme Court precedent, which goes a long way towards establishing that the analysis that the court reached on the Washington statute and Blakeley is not the kind of analysis that would fit the federal guidelines. The federal guidelines are distinct entirely from the kind of statutory system that existed in Washington and existed in New Jersey, which caused the Apprendi decision. Those states had two statutory maximums each. They had one statutory maximum for the crime of conviction. They had a higher statutory maximum in the event that the judge made findings of certain facts over and above what was encompassed or resulted from the plea or the conviction. Now, we don't have anything comparable to that. We have, in fact, going back as far as 15 years ago, the Mestreda case in 1989, the Supreme Court entertained a challenge to the constitutionality of the guidelines. It was mostly, I believe, primarily, and I apologize for incompleteness on this because this is so new, but I believe that the focus was on delegation of powers and separation of powers. And there was a statement, however, by the United States Supreme Court that the guidelines do not set minimums or maximums. They only fetter the discretion of judges in doing what they have always done. And I think they said for generations, quote, unquote, in applying various sensing factors within the statutory maximum. And that that is, in essence, something which the courts have always done. The guidelines system, then, is something that only assigns a system and a series of weights to the different factors which are discretionary within the statutory maximum provided by law. And that this is not different in kind from what courts have been doing since long before the guidelines came into existence. And that's how I've always viewed the guidelines, that they serve to codify the discretion and the factors and try to make them uniform to the district court judges we're using at that time across the country. But there's some language in Blakely that Justice Scalia wrote that causes some trouble in that analysis because he says that anything that serves to increase the sentence basically beyond the base offense level justified by the facts that the jury found or were admitted to by the defendant cannot be used. And he's all of a sudden, and this is to me kind of a negative consequence of Blakely, it's all of a sudden taking away all those factors that the judge is supposed to consider and saying no, the jury has to find them or they have to be admitted before they can be used to enhance the sentence. I don't recall his use of terminology like base offense level. Of course, what the Washington statute called it was something like standard range, but it was a statutory maximum for what the person is convicted of by a jury. In other words, the system itself set a maximum under the law, which was on the statute books, saying that if you get convicted of this crime, this is the maximum. Then a judge has the authority to go beyond that maximum to the higher maximum. And throughout my reading of Blakely, they refer to statutory maximum, and I don't think even though they put some meaning on that and gloss upon the definition of statutory maximum, I don't think that we could say that there's anything, in Blakely at least, I wasn't aware that there was anything there that had a tendency to change it to the point of taking it out of a congressional provision and equating it to something in the guidelines, which is nothing more than a systematization of judicial sentencing discretion. That's exactly how I read it initially, but I've been thinking about it further, and it seems a little more complicated than that. My time is up. There are several Supreme Court cases, Edwards, 523 U.S., Witt, 515 U.S., Watts, 519 U.S., Dunnigan, 507 U.S., that all talk about the various forms of judicial findings in sentencings within the statutory maximum, and they're all approved by the Supreme Court. Thank you, counsel. Thank you. Thank you. I would like to respond to some matters concerning the record. First of all, Mr. Henry did give the name of his doctor and identified him as being in Washington State but did not have the phone number for him. The person he was attempting to contact was a friend who he thought would have the doctor's number, and he also identified that he had a prescription or a note regarding the doctor at the friend's house in Fairbanks but was not offered the opportunity to go and get that. He made no request for medical assistance, which could have incited the stop at the hospital. And also of note is that although he began being in custody at 3.50 that afternoon, it wasn't until 7.15 that evening that the officers attempted to contact the DEA agent who had field testing capability. With respect to whether or not there was probable cause to arrest him for the crime of trespassing, it's our position that there was not. The information that was developed at the evidentiary hearing established that the policy of the billeting room facility was that the people who could rent those rooms were members of the military and that any guests that they had had to pay an additional fee. And as to whether there had been no action taken by the facility itself to evict the occupant or the occupants, and there was no attempt by them to assess additional fees, but absent the presence of the military member, obviously he could be asked to leave. That's not the same as trespassing. The problem was that the military person had left the military and had no right to rent the room. Had no right to rent the room. So obviously the tenancy could be terminated. There hadn't been any action to terminate at that particular point when he was confronted. And he was staying as a guest of the person who rented the room. Did he say he had stayed in the room or he just left his bag in the room? Well, I think that inferentially it was clear that he was a guest. He did not make a statement. What happened was that the gentlemen collectively, the four men were being interviewed together initially, and collectively they indicated they had stayed in the room because it was a cheap place to stay. There were two men who actually had bags containing clothing in the room. One was Mr. Henry and the other was another one of the gentlemen who was permitted to leave. Walked away from his bag? Beg your pardon? Did he walk away from his bag? Mr. Henry? No, the other one. No, he did not. Both gentlemen claimed their bags. And the other gentleman was also permitted to leave the base. Two of the gentlemen were permitted to leave the base. So there wasn't any arrest for trespassing or assertion that they had trespassed on the military base. I think the only determination was that they perhaps did not have a right to remain as guests in a room where the renter, the nominal renter, had not a right to rent the room because membership was limited. Counsel, clarify something for me on the facts. I'm not sure I remember it right. Was there a point where Henry was told that he was free to go, they'd drop him off at the entrance to the base so he could leave, and he said, well, let me go into the room first and get my bag? Well, I think he was told, along with the other gentleman, that they would be escorted off base. And that's when he was free to go. That's when we had the discussion, do you have a bag, do you want to get the bag? Or he or one of the gentlemen asked, can I get my bag? But he was never removed from cuffs. Wait a minute, what time was that? That was approximately, the men were basically put up against the wall at 3.50. The next time frame that's established in the evidentiary record is 5 o'clock for the discovery of the capsules. Hold on, you're not getting at my question. I'm thinking there's a moment there where if he will abandon his inventory, he's free to go. They're going to drop him off at the base entrance on Gaffney Road there, I suppose, and say goodbye. But instead of just saying goodbye, he says, let me go in there and get my bag. And that's when things get more complicated for him, if I recall this correctly. That's absolutely correct. That's the correct characterization of the record. And I want to know what time that is, because my thinking is once he's free to go, as long as he'll abandon his bag, that may be the end of his stop. Well, I will answer the question about the time frame first and then respond to your point. Okay. In terms of what's established in the record, here's all I've got, which is that at 3.50 is when they confronted the men. The two officers, one is wearing a federal special agent jacket, tell the men to get up against the wall, and they submit them to a bodily frisk. They then have to wait in that position for five to seven minutes, at which point two to four MPs arrive, subject the men to a second bodily frisk, and they're all put in handcuffs. Sometime after that, one of the men is taken away by the Fairbanks police officer. But in terms of a time frame, the next time frame that we have established in the record, according to my review, is the discovery of capsules, and that's approximated to be around 5 o'clock, and that's at Tab S at 3. And he remains in handcuffs, and the handcuffs are never removed. The next relevant time frame is that between 6 and 6.30, there's a transportation of Mr. Henry away from the base, first to the hospital, and then over to the station. 7.15, the DEA agent is finally contacted, asked to do some field testing, and 8 o'clock is when the DEA arrives and does the field testing. Now, with respect to whether or not it's significant that he's told that he will be released, I don't think it is a significant fact that he was almost released. The cuffs were never taken off. Well, at that point, though, it was up to him. They're not going to take the cuffs off until they get to the base entrance. They might control them until they get to the base entrance, but it was up to him whether to be released or whether to stay there and try to maintain control of his capsules. Well, except that the other gentleman was allowed to identify and retrieve his bag and was released. So obviously that... Did he open his bag? The other gentleman? I don't know. I don't know that he was asked to, and I don't know if he did or not. I have no idea. I think it's significant that the observations that the officer made of the capsules raised his suspicions immediately and made him suspect, both in terms of packaging and appearance, that they were drugs. Because, of course, we have inquiries and interrogation of the defendant as to what the items actually are, what drug there is, and because, of course, that's one of our complaints that he was not Mirandized prior to that questioning. Unless there are further questions. Thank you. Thank you, Counsel. United States v. Henry is submitted. Next is United States v. Continental Casualty. Thank you. Thank you.
judges: Hall, Kleinfeld, Wardlaw